**UNITED STATES COURT OF APPEALS**
FOR THE SIXTH CIRCUIT

100 EAST FIFTH STREET, ROOM 540
POTTER STEWART U.S. COURTHOUSE
CINCINNATI, OHIO 45202-3988

Deborah S. Hunt
Clerk

Tel. (513) 564-7000
www.ca6.uscourts.gov

Filed:  April 21, 2023

Ms. Sharon Sue Almonrode
Miller Law Firm
950 W. University Drive
Suite 300
Rochester, MI 48307

Mr. Kyle Michael Asher
Dykema
201 Townsend Street
Suite 900
Lansing, MI 48933

Mr. Steve W. Berman
Hagens Berman
1301 Second Avenue
Suite 2000
Seattle, WA 98101

Mr. Joel A. Dewey
Baker Donelson
100 Light Street
19th Floor
Baltimore, MD 21202

Ms. Stephanie Douglas
Bush, Seyferth
100 W. Big Beaver Road
Suite 400
Troy, MI 48084

Ms. Emily Hughes
Miller Law Firm
950 W. University Drive
Suite 300
Rochester, MI 48307

Mr. Adam J. Levitt
DiCello Levitt Gutzler
10 N. Dearborn Street
Eleventh Floor
Chicago, IL 60602

Mr. Dennis A. Lienhardt Jr.
Mr. E. Powell Miller
Miller Law Firm
950 W. University Drive, Suite 300
Rochester, MI 48307

Mr. John Tangren
DiCello Levitt Gutzler
10 N. Dearborn Street, Eleventh Floor
Chicago, IL 60602

Ms. Jill Margaret Wheaton
Dykema Gossett
2723 S. State Street, Suite 400
Ann Arbor, MI 48104

Re: Case No. 22-1245, *Marshall Lloyd, et al v. Ford Motor Company*
Originating Case No. : 2:19-md-02901 : 2:19-cv-11319 : 2:19-cv-11639 : 2:19-cv-11728 : 2:19-cv-11993 : 2:19-cv-12015 : 2:19-cv-12035 : 2:19-cv-12080 : 2:19-cv-12135 : 2:19-cv-12310 : 2:19-cv-12309 : 2:19-cv-12377 : 2:19-cv-12375 : 2:19-cv-12373 : 2:19-cv-12427 : 2:19-cv-12437 : 2:19-cv-12438 : 2:19-cv-12436 : 2:19-cv-12554 : 2:19-cv-12895 : 2:19-cv-13197 : 2:20-cv-12272

Dear Counsel,

The court today announced its decision in the above-styled case.

Enclosed is a copy of the court's published opinion together with the judgment which has been entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

Yours very truly,

Deborah S. Hunt, Clerk

Cathryn Lovely
Deputy Clerk

cc:  Ms. Kinikia D. Essix

Enclosures

Mandate to issue.

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 23a0080p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

_____

IN RE: FORD MOTOR COMPANY F-150 AND RANGER TRUCK FUEL ECONOMY MARKETING AND SALES PRACTICES LITIGATION.

_____

MARSHALL B. LLOYD; TRACEY TRAVIS; DUSTIN DAWSON AND RICK SHAWLEY; MICHAEL SMITH; EVAN ALLEN; AL BALLS; BRIAN LEJA; STEPHEN MATTSON; JOHN SAUTTER; RANDY TRANSUE; RICK SHURTLIFF; RONALD J. DISMUKES; JEFFERY FOSHEE; ACCURATE CONSTRUCTION CORPORATION; STEVE BEAVERS; DAVID BREWER; RYAN COMBS; VICTOR PEREZ; HAROLD BROWER; KYLE MANNION; NICHOLAS LEONARDI; DEAN KRINER; JAMES WILLIAMS; MATTHEW COMBS; DUSTIN WALDEN; STEVEN HULL; KENNETH BERNARD; MARK HILL; CODY SMITH; DANIEL GARDNER; ROBERT GOOLSBY; JOHN JUNG; MATTHEW SMITH; JOSH BRUMBAUGH; RYAN HUBERT; WILLIAM DON COOK; HILARY GOODFRIEND; KATHRYN HUMMEL; SCOTT FORMAN; DILLON DRAKE; RAMIN SARTIP, DARREN HONEYCUTT; AHMED ABDI; JAMAR HAYNES; SCOTT WHITEHILL; MATTHEW BROWNLEE; BENJAMIN BISCHOFF, STEPHEN LESZCZYNSKI; CASSANDRA MORRISON; ROBERT RANEY; DAVID POLLEY; MARK NAPIER; KEITH FENCL; MARK ARENDT; HARVEY ANDERSON; ROSALYNDA GARZA; JEFFREY QUIZHPI; JEFFREY KALOUSTIAN; RONALD CEREMELLO; RANDALL MAINGOT; GEORGE ANDREW RAYNE; ROBERT LOVELL; SAMUEL HUFFMAN,

> No. 22-1245

*Plaintiffs-Appellants*,

*v.*

FORD MOTOR COMPANY,

*Defendant-Appellee*.

Appeal from the United States District Court for the Eastern District of Michigan at Detroit.
Nos: 19-md-02901, 19-cv-11319, 19-cv-11639, 19-cv-11728, 19-cv-11728, 19-cv-11993, 19-cv-12015, 19-cv-12035, 19-cv-12080, 19-cv-12135, 19-cv-12309–12310, 19-cv-12373, 19-cv-12375, 19-cv-12377, 19-cv-12427, 19-cv-12436–12438, 19-cv-12554, 19-cv-12895, 19-cv-13197, and 20-cv-12272—Sean F. Cox, District Judge.

Argued: March 8, 2023

Decided and Filed: April 21, 2023

Before: GRIFFIN, BUSH, and MURPHY, Circuit Judges.

————————

## COUNSEL

**ARGUED:**  Steve W. Berman, HAGENS BERMAN SOBOL SHAPIRO LLP, Seattle, Washington, for Appellants. Stephanie A. Douglas, BUSH SEYFERTH PLLC, Troy, Michigan, for Appellee. **ON BRIEF:**  Steve W. Berman, HAGENS BERMAN SOBOL SHAPIRO LLP, Seattle, Washington, E. Powell Miller, Sharon S. Almonrode, Emily E. Hughes, THE MILLER LAW FIRM, Rochester, Michigan, Adam J. Levitt, John E. Tangren, DICELLO LEVITT GUTZLER LLC, Chicago, Illinois, for Appellants.  Stephanie A. Douglas, BUSH SEYFERTH PLLC, Troy, Michigan, Jill M. Wheaton, Kyle M. Asher, DYKEMA GOSSETT PLLC, Ann Arbor, Michigan, for Appellee.

————————

## OPINION

————————

GRIFFIN, Circuit Judge.

Plaintiffs are a group of consumers alleging that defendant Ford Motor Company intentionally submitted false fuel economy testing figures for certain vehicles to the U.S. Environmental Protection Agency (EPA).  Plaintiffs claim that this, in turn, led the agency to provide an inaccurate fuel economy estimate to consumers, which induced consumers (including plaintiffs) to buy those vehicles.  The district court ruled that federal law preempted plaintiffs' state-law claims.  We agree and affirm.

### I.

This case centers on allegations that Ford cheated on its fuel economy and emissions testing for certain truck models, including the F-150 and Ranger.  The Energy Policy and Conservation Act (EPCA), 42 U.S.C. § 6201 *et seq*., and its corresponding regulations specifically control such testing, so an initial overview of this testing regime is in order.

Congress enacted the EPCA in 1975 to develop a comprehensive regulatory scheme for fuel economy testing; the stated purposes of the act include "improv[ing] energy efficiency of motor vehicles" and "provid[ing] a means for verification of energy data to assure the reliability of energy data."  42 U.S.C. § 6201(5), (7).  This act introduced corporate average fuel economy

(CAFE) standards that automobile manufacturers must follow in designing, manufacturing, and marketing their vehicles. *See, e.g.*, 15 U.S.C. §§ 2001–13 (1975). In 1994, Congress updated those standards. *See* Pub. L. 103-272, 108 Stat. 745 (1994); 49 U.S.C. §§ 32901–19. Those standards, applicable today, require automobile manufacturers to follow the EPA's fuel economy standards, *see* § 32902, describe how the EPA and manufacturers calculate average fuel economy, *see* § 32904, dictate how manufacturers report the resulting figures, *see* § 32908, and set requirements for how the EPA ensures compliance with the CAFE standards, *see* § 32911. The EPA has the authority to implement these statutes by regulation. *See, e.g.*, 49 U.S.C. §§ 32902(k)(2); 32908(g)(1).

These statutes and corresponding regulations mandate that manufacturers follow a complex testing methodology set by the EPA. To produce testing data that the EPA uses in its own fuel economy calculation, manufacturers test the fuel economy of their vehicles with a dynamometer. 40 C.F.R. § 1066.401 *et seq.*; U.S. EPA, *How Vehicles are Tested*.[1] A dynamometer is essentially a "treadmill for vehicles" (as plaintiffs describe), and, as such, it does not naturally simulate other environmental and physical forces acting on a vehicle during normal operation like "aerodynamic drag, tire rolling resistance, driveline losses, and other effects of friction." 40 C.F.R. § 1066.301. The dynamometer thus must be calibrated to recreate those forces through incorporation of "road load" figures, 40 C.F.R.§ 1066.210(a), which is "the force imparted on a vehicle while driving at constant speed over a smooth level surface from sources such as tire rolling resistance, driveline losses, and aerodynamic drag," U.S. EPA, *2015-04: Determination and Use of Vehicle Road-Load Force and Dynamometer Settings* 2 (Feb. 23, 2015). "The general procedure for determining road-load force is performing coastdown tests and calculating road-load coefficients." 40 C.F.R. § 1066.301(b). "This procedure is described in SAE J1263 and SAE J2263" and "incorporated by reference in § 1066.1010," though the regulations allow "certain deviations from those procedures for certain applications." *Id.*[2]

---

[1] Available at: https://www.fueleconomy.gov/feg/how_tested.shtml (last visited April 19, 2023).

[2] "SAE" refers to the Society of Automotive Engineers, a "global association of more than 128,000 engineers and related technical experts in the aerospace, automotive, and commercial-vehicle industries." *About SAE International*, available at https://www.sae.org/about (last visited April 19, 2023). The SAE develops engineering mobility standards, including those referenced here, to further "[t]he design of safety, productivity, dependability,

Coastdown testing tells manufacturers "how much rolling resistance and drag a vehicle has[,] so that when a vehicle is testing on a dynamometer, the manufacturer knows how much drag and rolling resistance to apply to the vehicle to simulate the road." First Amended Complaint (Complaint), R.78, PageID 2056; *see also* U.S. EPA, *2015-04: Determination and Use of Vehicle Road-Load Force and Dynamometer Settings* 4. "In a coastdown test, a vehicle is brought to a high speed on a flat, straight road," at about eighty mph, "and then set coasting in neutral until it slows to a low speed," at about nine mph. Complaint, R.78, PageID 2151, 2168. The test is performed at least five times, and, each time, devices on the vehicle measure environmental conditions, performance data, speed, and distance traveled. *Id*. A manufacturer records the time it takes for a vehicle to slow as "[t]he test produces data that identifies or maps the drag and other forces acting on the vehicle in the real world." *Id*. at 2168–69. The coastdown testing ultimately produces the figures used for dynamometer testing (known as "target coefficients"), thus allowing the dynamometer to simulate the "actual load on the [vehicle's] engine during on-road driving." *Id*. at 2170–71, 2173.

Once a manufacturer determines a vehicle's road-load "target coefficients," 40 C.F.R. § 1066.301(a), it uses those coefficients in its simulated dynamometer testing, *see id.* § 1066.210. The EPA also heavily regulates this testing, *see* 49 U.S.C. § 32904(c), and its regulations again prescribe the exact process (and formulas) a manufacturer must use. *See* 40 C.F.R. § 600.210-12(a), (b); U.S. EPA, *Testing at the National Vehicle and Fuel Emissions Laboratory*.[3]

Throughout this entire process, manufacturers must "establish, maintain, and retain" records relating to their testing, 40 C.F.R. § 600.005(a), and allow the EPA to access or inspect testing facilities, *id.* § 600.005(b). Once a manufacturer has finished testing a vehicle, it must submit the results and supporting documentation to the EPA. *Id.* § 600.006; *see also* 49 U.S.C. § 32907(b). The EPA may require the manufacturer to submit the disputed vehicle for testing or to conduct additional testing itself if, "based on the results of an inspection . . . or any other

---

efficiency, and certification." *See SAE Standards*, available at https://www.sae.org/standards (last visited April 19, 2023).

[3]Available at: https://www.epa.gov/greenvehicles/testing-national-vehicle-and-fuel-emissions-laboratory (last visited April 19, 2023).

information," the agency "has reason to believe that the manufacturer has not followed proper testing procedures," the "testing equipment is faulty or improperly calibrated," or the records provided to the EPA cannot confirm the manufacturer's figures. 40 C.F.R. § 600.008(e)(1).

Once a manufacturer submits data for review, that data "must be judged reasonable and representative" by the EPA. *Id.* § 600.008(c)(1). In reviewing the data, the EPA may accept it, require additional manufacturer testing, or perform its own confirmatory testing. *Id.* § 600.008(c). The EPA confirms about "15-20%" of manufacturer-provided test results through its own testing. U.S. EPA, *How Vehicles are Tested*. If it does perform such testing, it compares its own data with that provided by the manufacturer; if an "unacceptable" discrepancy exists, the EPA may reject "all fuel economy data submitted by the manufacturer until the cause of the discrepancy is determined and the validity of the data is established by the manufacturer." 40 C.F.R. § 600.008(a), (d). If the agency does not perform its own confirmatory testing, a manufacturer "must" instead perform said testing if certain "conditions" exist, including a prior failure of an emissions standard or that the reported fuel economy is "higher than expected based on procedures approved by the" EPA. *Id*. § 600.008(b)(1). The EPA evaluates confirmatory results submitted by the manufacturer for "reasonableness and representativeness." *Id.* § 600.008(c)(3).

Once the EPA is satisfied with the fuel economy figure, it adopts that figure as its own. *See* 49 U.S.C. § 32904(c) (dictating that "[t]he [EPA] Administrator *shall measure* fuel economy for each model and calculate average fuel economy for a manufacturer under testing and calculation procedures prescribed by the Administrator") (emphasis added). The EPCA establishes that the "fuel economy" of a vehicle produced by these procedures is "the average number of miles traveled by an automobile for each gallon of gasoline (or equivalent amount of other fuel) used, *as determined by the [EPA] Administrator* under [49 U.S.C. §] 32904(c)." *Id.* § 32901(a)(11) (emphasis added). And the regulations provide that, so long as the estimates satisfy the EPA's prescribed testing procedures, "[t]he label values that the manufacturer calculates and submits . . . shall constitute the EPA fuel economy estimates." 40 C.F.R. § 600.312-08(a)(3). *See also* Fuel Economy Labeling of Motor Vehicles: Revisions To Improve Calculation of Fuel Economy Estimates, 71 Fed. Reg. 77872, 77872–76 (Dec. 27, 2006) (to be

codified at 40 C.F.R. pts. 86 and 600) (describing the estimates as "the EPA fuel economy estimates"). This figure is included by law on the label, colloquially called a "Monroney" sticker, that is attached to each new vehicle sold. 49 U.S.C. § 32908(b)(1)(A); 40 C.F.R. § 600.302-12; *see also* Fuel Economy Labeling of Motor Vehicles, 71 Fed. Reg. at 77916 n.80.

The purpose of the standardized EPA estimate is two-fold. It not only "provide[s] consumers with a basis on which to compare the fuel economy of different vehicles," but it also "provide[s] consumers with a reasonable estimate of the fuel economy they can expect to achieve." Fuel Economy Labeling of Motor Vehicles, 71 Fed. Reg. at 77873. But the EPA also warns consumers that the estimates are, indeed, estimates. "[F]uel economy varies from driver to driver for a wide variety of reasons, such as different driving styles, climates, traffic patterns, use of accessories, loads, weather, and vehicle maintenance." *Id.* at 77874; *see also* 40 C.F.R. § 600.302-12(b)(4) (providing that the Monroney sticker must include the disclaimer: "Actual results will vary for many reasons, including driving conditions and how you drive and maintain your vehicle.").

The EPA monitors compliance with these requirements. *See* 49 U.S.C. §§ 32910–12. If the EPA suspects that a manufacturer has "fail[ed] to comply with an applicable average fuel economy standard" under § 32902, it "shall conduct a proceeding, with an opportunity for a hearing on the record, to decide whether a violation has been committed." *Id.* § 32911(b). If, at any point during the model year, the EPA determines that the label values have been calculated incorrectly, it may correct those figures or require the manufacturer to do so. 40 C.F.R. § 600.312-08(a)(5). Among the possible violations a manufacturer could commit would be in its "obligation to report truthful and complete information" following testing. 40 C.F.R. § 1066.2(b); *see also* 49 U.S.C. § 32911. The EPA may "void any certificates or approvals associated with a submission of information," including "for all engine families certified based on emission data collected," if it determines that the manufacturer "intentionally submitted false, incomplete, or misleading information." 40 C.F.R. § 1066.2(c). Civil and criminal penalties may also apply. *Id.* § 1066.2(b) (citing 18 U.S.C. § 1001 and 42 U.S.C. § 7413(c)(2)).

While the EPA regulates the fuel economy estimate provided to consumers on the Monroney sticker, the Federal Trade Commission (FTC) regulates advertising to consumers. Fuel Economy Labeling of Motor Vehicles, 71 Fed. Reg. at 77917. Its "Guide Concerning Fuel Economy Advertising for New Vehicles . . . advises vehicle manufacturers and dealers how to disclose the established fuel economy of a vehicle, as determined by the [EPA's] rules." *Id*. The FTC also discourages manufacturers from advertising other fuel economy figures beyond that determined by the EPA: "Given consumers' exposure to EPA estimated fuel economy values over the last several decades, fuel economy and driving range estimates derived from non–EPA tests can lead to deception if consumers understand such estimates to be fuel economy ratings derived from EPA–required tests." 16 C.F.R. § 259.4(*l*)(1). "Accordingly, advertisers should avoid such claims and disclose the EPA fuel economy or driving range estimates." *Id*.

## II.

Pursuant to this testing regime, Ford conducted testing and provided the resulting figures to the EPA for the 2018, 2019, and 2020 F-150 and 2019 and 2020 Ranger trucks. The EPA then published its fuel-economy estimates for those vehicles. The F-150 had an EPA-estimated mpg of 20 city, 26 highway, and 22 combined, while the Ranger had an EPA-estimated 20 city, 25, highway, and 22 combined mpg. Ford used these figures in its advertisements, promoting the 2019 Ranger as the "most fuel-efficient gas-powered midsize pickup in America" and the F-150 as "best in class for fuel economy."

Plaintiffs claim, however, that Ford committed fraud in its testing. In September 2018, several Ford employees questioned the testing process, which led to Ford announcing that it would investigate its testing of the 2019 Ranger and other vehicles. It then disclosed that it was under criminal investigation by the Department of Justice (DOJ) for its emissions and fuel-efficiency testing. Several other agencies opened investigations, including the EPA. After these allegations arose, independent car reviewers performed "real-world mileage" tests and determined that the actual performance of the Ranger and other vehicles was "nowhere close" to the EPA estimates. Complaint, R.78, PageID 2157–58.

Plaintiffs tested the 2018 Ford F-150 and 2019 Ford Ranger to verify the fuel economy of those vehicles.  Their testing (which they contend conformed to the EPA's standards) showed that Ford fraudulently reduced the road-load resistance level used in the dynamometer testing. The road-load figures obtained from the "coastdown [tests] for each vehicle [were] found to have more resistance (which would result in more fuel consumption) than the road-load models reported to the EPA."  Complaint, R.78, PageID 2172.  They determined that the mpg estimates of the F-150 should be 17.7 city, 22.7 highway, and 20.0 combined, with the Ranger being 18.3, 23.4, and 20.6, respectively.  In short, plaintiffs' testing allegedly proves that the EPA estimates for both those truck models are several mpg better than what they should be.  This means that both trucks consume much more fuel than previously estimated, costing consumers thousands of dollars in added fuel cost.

Plaintiffs then filed a host of putative class-action suits alleging that Ford cheated during its coastdown testing procedure to ensure that it received a more favorable fuel economy estimate from the EPA.  The Judicial Panel on Multidistrict Litigation consolidated those cases in the Eastern District of Michigan.  The district court directed plaintiffs to file a consolidated master complaint, and the ensuing complaint, at nearly 1,000 pages long, included claims of breach of contract, negligent misrepresentation, breach of express warranty, fraud, and unjust enrichment under the laws of every state.  Plaintiffs requested several forms of relief, including: 1) certification of the proposed class; 2) "Declaring, adjudging, and decreeing the conduct of the Defendant as alleged herein to be unlawful, unfair, and deceptive"; 3) "Requiring that all Class members be notified about the lower fuel economy ratings and higher emissions at Ford's expense and providing correct fuel economy and emissions ratings"; and 4) awarding plaintiffs restitution and damages.  *Id*. at 3014–15.

Ford moved to dismiss the complaint, raising a host of reasons.  Pertinent for our purposes, Ford contended that 1) federal law both expressly and impliedly preempted plaintiffs' claims, 2) the EPA had primary jurisdiction over the case, such that the district court should dismiss the case, and 3) plaintiffs' misrepresentation and omission claims failed to state a claim upon which relief can be granted.  The district court agreed with Ford on all counts and

dismissed plaintiffs' complaint.[4]  *In re Ford Motor Co. F-150 & Ranger Truck Fuel Econ. Mktg. & Sales Pracs. Litig.*, No. 2:19-md-02901, 2022 WL 551221 (E.D. Mich., Feb. 23, 2022). Plaintiffs timely appealed.

### III.

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted).  We review de novo a district court's decision to dismiss a case under Rule 12(b)(6), *Taylor v. City of Saginaw*, 922 F.3d 328, 331 (6th Cir. 2019), including whether the district court properly did so on federal preemption grounds, *McDaniel v. Upsher-Smith Labs., Inc.*, 893 F.3d 941, 944 (6th Cir. 2018). In doing so, we must "construe the complaint in the light most favorable to the plaintiff and accept all allegations as true." *Taylor*, 922 F.3d at 331 (citation omitted).  The defendant has the burden of showing that a plaintiff has failed to state a plausible claim for relief. *Id*. at 331–32.

### IV.

The Supremacy Clause of the U.S. Constitution provides that "the Laws of the United States . . . shall be the supreme Law of the Land . . . , any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."  U.S. Const. art. VI, cl. 2.  "The phrase 'Laws of the United States' encompasses both federal statutes themselves and federal regulations that are properly adopted in accordance with statutory authorization."  *City of New York v. F.C.C.*, 486 U.S. 57, 63 (1988).  Thus, "state laws that 'interfere with, or are contrary to the laws of congress, made in pursuance of the constitution' are invalid."  *Wis. Pub. Intervenor v. Mortier*, 501 U.S. 597, 604 (1991) (quoting *Gibbons v. Ogden*, 9 Wheat. 1, 211 (1824)).  This inquiry is largely one of congressional intent, i.e., whether the statute demonstrates an "intent to supplant state authority in a particular field."  *Id*. at 604–05.  In line with the standards governing motions for

---

[4]While the case progressed, the federal investigations into Ford's alleged fraud did too.  By the time Ford moved to dismiss the complaint, the DOJ had closed its investigation and did not intend to take further action.  The EPA similarly closed its own investigation shortly before the district court issued its decision.  On appeal, plaintiffs have acknowledged that these investigations closed without further agency action.

dismissal, a defendant bears the burden of proof in establishing preemption as grounds for dismissal.  *Brown v. Earthboard Sports USA, Inc.*, 481 F.3d 901, 912 (6th Cir. 2007).

Ordinary preemption provides an affirmative defense to support dismissal of a claim (as Ford did here).  *Hudak v. Elmcroft of Sagamore Hills*, 58 F.4th 845, 852 (6th Cir. 2023).[5] "State-law claims can be preempted expressly in a federal statute or regulation, or impliedly, where congressional intent to preempt state law is inferred."  *McDaniel*, 893 F.3d at 944 (citation omitted).  Through an express preemption clause, Congress may make clear "that it is displacing or prohibiting the enactment of state legislation in a particular area."  *Matthews v. Centrus Energy Corp.*, 15 F.4th 714, 720 (6th Cir. 2021).  By contrast, implied preemption applies in one of two forms:  field or conflict.  *Id.*  "Field preemption occurs 'where the scheme of federal regulation is so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it.'"  *Id.* (quoting *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 98 (1992)).  Conflict preemption may instead be present when "Congress has not entirely displaced state regulation over the matter in question."  *Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 248 (1984).  In that circumstance, state law may be preempted "to the extent it actually conflicts with federal law, that is, when it is impossible to comply with both state and federal law, or where the state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress."  *Id.* (internal citations omitted).

A.

We begin and end with implied preemption.  Ford asserts that plaintiffs' fraud-on-the-agency claims are impliedly preempted because those claims conflict with the EPA's testing and fraud-policing authority set forth in the EPCA and with the fact that the EPA is responsible for the fuel economy figures.  Plaintiffs say otherwise, arguing their claims are based on state-law duties that are identical to those that federal law imposes on auto manufacturers.  We agree with

---

[5]Ordinary preemption is distinguished from the "misleadingly named doctrine" of complete preemption, a "jurisdictional" doctrine under which a court could conclude "that the pre-emptive force of a statute is so extraordinary that it converts an ordinary state common-law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule."  *Hogan v. Jacobson*, 823 F.3d 872, 879 (6th Cir. 2016) (quotation marks omitted).  This "complete preemption" doctrine is a narrow one that the Supreme Court has applied in only three statutory settings.  *See Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1, 6–11 (2003).

Ford and conclude that plaintiffs' claims inevitably conflict with the EPCA and its regulatory scheme.[6]

In this, as in any preemption inquiry, the Supreme Court instructs that the "purpose of Congress is the ultimate touchstone," as "explicitly stated in the statute's language or implicitly contained in its structure and purpose." *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992) (citations omitted). We normally "apply a strong presumption against implied preemption in fields that States traditionally regulate" because "preemption can trammel upon state sovereignty." *Torres v. Precision Indus.*, 995 F.3d 485, 491 (6th Cir. 2021) (per curiam) (citation and internal quotation marks omitted); *cf. Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 579 U.S. 115, 125 (2016). Further, the presence of an express preemption provision "does *not* bar the ordinary working of conflict pre-emption principles." *Geier v. Am. Honda Motor Co., Inc.*, 529 U.S. 861, 869 (2000).

Although no court has addressed implied preemption in this specific context, we do not write on a blank slate—a host of caselaw exists addressing similar fraud-on-the-agency claims in the context of implied preemption. *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341 (2001), is the seminal case. There, the plaintiffs claimed injuries resulting from bone screws that had been reviewed and approved by the Food and Drug Administration (FDA). *Id.* at 343–46. The Court began its analysis by noting that no presumption against preemption existed in this context: "Policing fraud against federal agencies is hardly 'a field which the States have traditionally occupied,' such as to warrant a presumption against finding federal pre-emption of a state-law cause of action." *Id.* at 347 (internal citation omitted). Instead, "the relationship between a federal agency and the entity it regulates is inherently federal in character because the relationship originates from, is governed by, and terminates according to federal law." *Id.*

Given that lack of presumption, the Court held that "the plaintiffs' state-law fraud-on-the-FDA claims conflict with, and are therefore impliedly pre-empted by, federal law." *Id.* at 348. Its reasoning was straightforward—the federal scheme empowered the FDA to punish and deter

---

[6]Given that our conclusion on implied preemption disposes of the case entirely, we need not address the alternative arguments the parties raise, including express preemption. *See Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 348 n.2 (2001).

fraud, and the agency used that authority to balance several statutory objectives, which state-law fraud-on-the-agency claims would skew. *Id.* For example, the FDA has "a variety of enforcement options that allow it to make a measured response to suspected fraud upon the [agency]." *Id.* at 349. And the FDA had "flexibility" in pursuing its objectives, including "the difficult task of regulating the marketing and distribution of medical devices without intruding upon decisions statutorily committed to the discretion of health care professionals." *Id.* at 349–50. Thus, state-law fraud-on-the-agency claims would "inevitably conflict with the FDA's responsibility to police fraud consistently with the Administration's judgment and objectives." *Id.* at 350. "In sum, were plaintiffs to maintain their fraud-on-the-agency claims here, they would not be relying on traditional state tort law" predating the federal law at issue. *Id.* at 353. "On the contrary, the existence of these federal enactments is a critical element in their case;" the claims existed solely because of the FDA's regulatory and disclosure scheme. *Id.* Therefore, "this sort of litigation would exert an extraneous pull on the scheme established by Congress, and it is therefore pre-empted by that scheme." *Id.*

Courts have applied *Buckman* to other regulatory schemes. Consider *Garcia v. Wyeth-Ayerst Laboratories*, 385 F.3d 961 (6th Cir. 2004). There, we held that a Michigan statute immunizing drug manufacturers from product-liability claims was not facially unconstitutional; as part of our analysis, we concluded that a state-law fraud-on-the-FDA tort claim was impliedly preempted under *Buckman*. *Id.* at 965–66. In so doing, we reasoned that "*Buckman* teaches that state tort remedies requiring proof of fraud committed against the FDA are foreclosed since federal law preempts such claims." *Id.* at 966 (citation omitted).

The Ninth Circuit similarly applied *Buckman* to hold that state-law claims of improper disclosures related to the harmful effects of a pesticide were preempted under the Federal Insecticide, Fungicide, and Rodenticide Act. *Nathan Kimmel, Inc. v. DowElanco*, 275 F.3d 1199, 1205–06 (9th Cir. 2002). That act, like the FDA scheme in *Buckman*, "is a comprehensive regulatory scheme aimed at controlling the use, sale, and labeling of pesticides," and it both required EPA approval of a pesticide's label and prohibits submitting false information. *Id.* at 1204. The Ninth Circuit concluded that *Buckman*'s analysis similarly applied—the scheme empowered the EPA to punish fraud, the balancing of statutory objectives can be skewed by

allowing fraud-on-the-agency claims to proceed, and "the existence of the [act's] requirements are similarly a critical element of [the plaintiff's] state-law case." *Id*. at 1204–06.

And in *Farina v. Nokia, Inc.*, the Third Circuit held that state-law claims alleging the fraudulent marketing of cell phones as safe despite their dangerous radio frequencies were preempted by federal law governing the Federal Communications Commission (FCC). 625 F.3d 97, 104 (3d Cir. 2010). "The Supreme Court's preemption case law indicates that regulatory situations in which an agency is required to strike a balance between competing statutory objectives lend themselves to a finding of conflict preemption." *Id*. at 123 (citing *Buckman*, 531 U.S. at 348). The purpose of the FCC's regulations was to balance protecting the public from emissions with enabling companies to supply quality services in a cost-effective way, and the FCC's balancing of these objectives "is a policy question, not a legal one." *Id*. at 124–25 (citation omitted). "A jury determination that cell phones in compliance with the FCC's [radio frequency] guidelines were still unreasonably dangerous would, in essence, permit a jury to second guess the FCC's conclusion" and, given that state-law standards vary, "eradicat[e] the uniformity necessary to regulating the wireless network." *Id*. at 125–26.

*Buckman* and its progeny apply with equal force here—the regulatory scheme governing the EPA's approval of fuel economy estimates preempts plaintiffs' state-law claims. Both the EPCA and its corresponding regulations set the standards for testing that a manufacturer *must* follow. The regulations dictate how a manufacturer must test on a dynamometer, *see, e.g.*, 40 C.F.R. § 1066.401, *et seq*., and how to input correct road-load figures to simulate normal drag and friction, *id*. §§ 1066.301, 1066.1010. They set specific standards for testing, *id*. § 1066.301(b), and provide formulas to calculate city and highway fuel mileage, *id*. § 600.210-12. Throughout this process, the EPA is empowered to investigate suspected fraud. *See* 49 U.S.C. §§ 32910–12. If it suspects a manufacturer is not following proper testing procedures, the agency may require the manufacturer to submit the vehicle for inspection or to conduct additional testing. 40 C.F.R. § 600.008. When a manufacturer later submits proposed figures, the EPA must review them for reasonableness before adopting those figures; if those figures are not reasonable, the EPA may again require additional testing. *Id*. Manufacturers have an obligation to submit truthful information, and the EPA may take corrective or punitive action if

information is incomplete or false.  40 C.F.R. § 1066.2.  The EPA thus "has at its disposal a variety of enforcement options that allow it to make a measured response to suspected fraud upon the Administration."  *Buckman*, 531 U.S. at 349.  And, ultimately, the fuel economy figure is the EPA's own; it is not adopted or published unilaterally by Ford (or by any other manufacturer).  *See* 49 U.S.C. §§ 32904(c), 32901(a)(11).

The EPA uses this regulatory scheme to "achieve a somewhat delicate balance of statutory objectives" in providing fuel economy estimates.  *See Buckman*, 531 U.S. at 348.  The testing regime—whereby manufacturers test the vehicles and submit the figures before the EPA may confirm those figures in several ways—is "designed to represent a reasonable balance between the need for accurate fuel economy data and the need to contain the cost of testing for both industry and EPA."  Fuel Economy Labeling of Motor Vehicles, 71 Fed. Reg. at 77881.  The "criteria for use of the mpg-based approach . . . are based on the balance of three factors."  *Id*. at 77897.  "First, [the EPA] designed them to be sufficiently large so that typical test-to-test variability would not cause a test group to fail the criteria."  *Id*.  "Second, [the EPA] want[ed] to minimize the potential error in the fuel economy label."  *Id*.  "Third, [the EPA] want[ed] to avoid requiring additional fuel economy testing that will have little to no impact on the label values."  *Id*.  This balance is reflected in what the EPA requires for approval of fuel economy figures:  that they be "reasonable and representative."  40 C.F.R. § 600.008(c)(1).  The EPA does not require the figures to be strictly accurate; rather, they must be reasonably related to the testing performed and the EPA's expected fuel economy ratings.  This demonstrates that the EPA has significant discretion throughout this process.

Plaintiffs' claims inevitably conflict with this regime.[7]  First, because the EPA accepted Ford's testing information and published its estimate based on that information, plaintiffs' claims essentially challenge the EPA's figures.  *Cf. Farina*, 625 F.3d at 122 ("Whether or not Farina intends to expressly challenge the FCC standards at trial, the inescapable effect of his complaint is to do so.").  To evaluate their claims, a jury would have to decide whether Ford's testing

---

[7]As a threshold matter, *Buckman* made clear that state law has not traditionally regulated fraud against a federal agency; that relationship is "inherently" federal because it owes its very existence to federal law.  531 U.S. at 347–48.  Thus, unlike in other circumstances where states *have* traditionally regulated conduct, *cf. Torres*, 995 F.3d at 491, no presumption against preemption exists here (and plaintiffs do not argue to the contrary).

figures are correct or fraudulent.  This inescapably and impermissibly puts a jury into the EPA's regulatory shoes.  *See id.* at 125 ("Allowing juries to impose liability on cell phone companies for claims like Farina's would conflict with the FCC's regulations.").  So even though the EPA exercised its statutory duty and found Ford's testing to be acceptable, a jury would still make its own determination, thus conflicting with the EPA's authority to set its own fuel-economy figures.

Second, allowing juries to second-guess the EPA's fuel economy figures would permit them to rebalance the EPA's objectives.  As explained, the EPA's process accounts for several factors, including cost, accuracy of data, and redundancy of testing.  *See* Fuel Economy Labeling of Motor Vehicles, 71 Fed. Reg. at 77881, 77897.  The EPA does not require manufacturers' fuel economy figures to be stringently accurate, and it warns consumers that estimates may vary.  *See* 40 C.F.R. § 600.302-12(b)(4).  It is for the EPA, not a jury, to balance its own objectives in determining whether fuel economy data is reasonable:  "Allowing juries to perform their own risk-utility analysis and second-guess the [EPA's] conclusion would disrupt the expert balancing underlying the federal scheme."  *Farina*, 625 F.3d at 126.  Because the EPA's authority must balance certain statutory objectives, it "can be skewed by allowing fraud-on-the-[EPA] claims under state tort law."  *Buckman*, 531 U.S. at 348; *see also Geier*, 529 U.S. at 875–81 (holding that federal law preempted state-law claims based on the lack of airbags because the Department of Transportation's regulation depended on a balancing of multiple factors, such as safety, cost, technological development, and consumer preferences).

Third, as the EPA has the authority to approve or reject fuel economy figures, its "federal statutory scheme amply empowers the [agency] to punish and deter fraud."  *Buckman*, 531 U.S. at 348.  The EPA has several statutory and regulatory ways to police suspected fraud and monitor compliance with its testing procedures.  *See, e.g.*, 49 U.S.C. § 32910; 40 C.F.R. § 600.312-08; 40 C.F.R. § 600.008; 40 C.F.R. § 1066.2.  Thus, "Congress has afforded the EPA substantial enforcement powers under [the EPCA] that enable the EPA to make a measured response to suspected fraud against it," including conducting hearings, requiring additional testing, and rejecting a manufacturer's data.  *Kimmel*, 275 F.3d at 1205–06.  Both determining whether a manufacturer has committed fraud against the agency *and* policing said fraud is,

consequently, the responsibility of the EPA. Such explicit authority was a foundational reason *Buckman* determined the claims at issue were preempted. *See* 531 U.S. at 350 ("State-law fraud-on-the-FDA claims inevitably conflict with the FDA's responsibility to police fraud consistently with the Administration's judgment and objectives."). In adjudicating a state-law claim, a jury would be empowered to usurp the EPA's fraud-policing powers.

Finally, state-law claims would skew the disclosures that manufacturers need to make to the EPA. Manufacturers like Ford have documentation that they must submit to the EPA, and the EPA has the responsibility to determine whether this documentation is sufficient. *See* 40 C.F.R. § 600.008(e)(1). But if a state-law claim were to proceed, a jury may find this documentation inadequate even if the EPA had previously determined otherwise. Thus, as was noted in *Buckman*, "[a]pplicants would then have an incentive to submit a deluge of information that the Administration neither wants nor needs, resulting in additional burdens on the [EPA's] evaluation" of the manufacturer's fuel economy data. 531 U.S. at 351. This would burden the agency's approval process and obstruct its goal of "provid[ing] consumers with a basis on which to compare the fuel economy of different vehicles." Fuel Economy Labeling of Motor Vehicles, 71 Fed. Reg. at 77873.

In sum, federal law provides how the EPA regulates fuel economy standards and what the EPA must balance in arriving at its own estimates. It similarly gives the EPA significant authority to investigate and deter fraud. State-law tort claims, like plaintiffs', would skew this balance and permit juries to take the EPA's place in determining whether fuel economy estimates are reasonable. Therefore, as with the claims and regulatory scheme in *Buckman*, plaintiffs' claims are preempted as conflicting with federal law. *See* 531 U.S. at 348.

## B.

Plaintiffs contend that several Supreme Court cases dictate the opposite conclusion. First, they cite *Wyeth v. Levine*, where the Supreme Court addressed preemption of state-law claims based on a manufacturer's failure to warn consumers of a drug's possible side effects. 555 U.S. 555, 559–60 (2009). The Court held that the FDA's approval of the drug label did not preempt these claims—under the federal regulatory scheme at issue, the manufacturer bore the

responsibility for the label's contents, and the regulations permitted unilateral alteration of the label.  *Id*. at 568–73.  Therefore, the state-law claims complemented federal law, and the manufacturer "failed to demonstrate that it was impossible for it to comply with both federal and state requirements."  *Id*. at 573.  Then, they point to *Silkwood v. Kerr-McGee Corp.*, where the Court determined that federal law did not preempt a state damages award arising from an escape of plutonium from a nuclear facility.  464 U.S. at 241, 258.  Congress had provided strict safety regulations for such facilities, but it never provided any remedy for a violation of those standards that would preempt a state law.  *Id*. at 253–56.  Thus, "Congress assumed that state-law remedies, in whatever form they might take, were available to those injured by nuclear incidents."  *Id*. at 256.  And, finally, they raise *Medtronic v. Lohr*, where the Court held that state-law claims were not preempted by a statute prohibiting requirements that were "different from, or in addition to," federal requirements.  518 U.S. 470, 492–502 (1996).  Nothing in the preemption statute at issue denied a state "the right to provide a traditional damages remedy for violations of common-law duties when those duties parallel federal requirements."  *Id*. at 495; *see also Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 447–48 (2005) (concluding that, so long as a state law imposed only a "parallel requirement[]," no express preemption applied—the statute did "not preclude States from imposing different or additional *remedies,* but only different or additional *requirements*"); *Fulgenzi v. PLIVA, Inc.*, 711 F.3d 578, 586–87 (6th Cir. 2013) ("[The plaintiff's] suit is not even *premised* on violation of federal law, but rather on an independent state duty.  The alleged breach arises from the same act, but the legal basis is different.  This is simply not grounds for preemption.").  Plaintiffs claim that these cases illustrate how Ford's state-law duties are identical to the EPCA's and that, given Ford's fraud, Ford can comply with both to rectify their actions.  We cannot agree.

First, plaintiffs' fraud-on-the-agency claims here arose out of the EPCA's requirements—i.e., that Ford failed to follow the EPCA by not providing truthful information as required by the EPCA—not solely out of state-law tort principles.  "[T]he existence of these federal enactments is a critical element in their case."  *Buckman*, 531 U.S. at 353.  Both *Buckman* and *Kimmel* distinguished *Medtronic* and similar caselaw on this basis.  *See id*. at 352 ("[I]t is clear that the *Medtronic* claims arose from the manufacturer's alleged failure to use reasonable care in the

production of the product, not solely from the violation of FDCA requirements."); *Kimmel*, 275 F.3d at 1206 ("[W]e believe that the existence of the FIFRA requirements are similarly a critical element of Kimmel's state-law case . . . ."). While plaintiffs' claims may be founded in part on state-law fraud principles, they are also *necessarily* premised on violations of federal law, namely a failure to follow the testing procedures set by the EPA. To demonstrate that Ford committed fraud, plaintiffs would need to show that Ford failed to follow the EPA-proscribed testing procedures or its obligation to report truthful information to the EPA. 40 C.F.R. § 1066.2(b). Their claims would not exist without specific standards regulating the dynamometer, "road load," and coastdown testing process. Therefore, plaintiffs' claims could not exist apart from federal law. *See Buckman*, 531 U.S. at 353 ("[A]lthough *Medtronic* can be read to allow certain state-law causes of actions that parallel federal safety requirements, it does not and cannot stand for the proposition that any violation of the FDCA will support a state-law claim.").

Second, unlike in *Silkwood*, Congress has not disclaimed providing any remedy for violating the EPA testing process. To the contrary, the regulatory scheme gives the EPA significant authority to investigate and correct alleged fraud. *See* 49 U.S.C. §§ 32910–12. The EPA may impose any number of civil or criminal penalties, including voiding fuel economy data for all related engine families. 40 C.F.R. § 1066.2(c). These enforcement authorities, combined with the balancing of EPA's interests and the fact that these numbers belong to the EPA, strongly suggest that Congress intended that the EPCA be enforced by the federal government. *See Buckman*, 531 U.S. at 352.

Third, and crucially, the regulatory scheme governing fuel economy standards *requires* the EPA to approve those figures and publish them as its own. While Ford must provide the requisite testing data to the EPA, it is the EPA's responsibility to determine whether that data is "reasonable"; after doing so, the EPA adopts those figures. *See, e.g.*, 49 U.S.C. § 32901(a)(11); 40 C.F.R. § 600.312-08(a)(3). The EPA must give its own approval, all the while balancing its statutory and regulatory objectives. This renders *Levine* distinguishable, where the manufacturer was responsible for the contents of the drug's label and could alter it unilaterally without agency approval. 555 U.S. at 568–73.

*PLIVA, Inc. v. Mensing*, which held that federal law preempted the state-law failure-to-warn claims at issue, confirms this distinction. 564 U.S. 604, 609 (2011). The manufacturers in *Mensing*—unlike in *Levine*—did not have the unilateral authority to modify the drug labels: "Before the Manufacturers could satisfy state law, the FDA—a federal agency—had to undertake special effort permitting them to do so." *Id.* at 623. "[W]hen a party cannot satisfy its state duties without the Federal Government's special permission and assistance, which is dependent on the exercise of judgment by a federal agency, that party cannot independently satisfy those state duties for pre-emption purposes." *Id.* at 623–24. The scheme at issue here is like that in *Mensing*—Ford has no authority to modify or update the fuel economy figures for its vehicles once the EPA has accepted those figures. It *must* go through the EPA, which has already balanced several objectives in reaching its figures. *Levine* did not involve such a balancing of factors—another reason that it is distinguishable. *See, e.g.*, *Farina*, 625 F.3d at 130 ("[*Levine*] was not a balancing case.").

Finally, plaintiffs attempt to rescue their case by arguing that Ford committed fraud on consumers, not just the agency. But that distinction is immaterial for reasons previously noted—any fraud committed by Ford on consumers is a byproduct of alleged fraud committed on the EPA. One does not exist apart from the other. Consequently, plaintiffs' claims for fraud on consumers exist solely because of the EPCA's requirements. *Cf. Buckman*, 531 U.S. at 353. In any event, Ford's advertisements relied solely on the EPA estimates to proclaim that the Ranger was the "most fuel-efficient gas-powered midsize pickup in America" and that the F-150 had a "best-in-class EPA-estimated highway fuel efficiency rating of 30 mpg." Mere reliance on the EPA estimates, without making any further disclosures about a vehicle's supposed real-world fuel economy, is not enough. *See, e.g.*, *Gray v. Toyota Motor Sales, U.S.A., Inc.*, 554 F. App'x 608, 609 (9th Cir. 2014) ("[A]s a matter of law, there is nothing false or misleading about a car manufacturer's advertising that identifies the EPA fuel economy estimates for the car." (citation omitted)); *In re Ford Fusion and C-MAX Fuel Econ. Litig.*, No. 13-MD-2450 (KMK), 2015 WL 7018369, at *27 (S.D.N.Y. Nov. 12, 2015) ("To the extent that Plaintiffs' claims rest on Defendant's mere use of EPA estimates . . . such claims are [expressly] preempted." (citation and original brackets omitted)). Indeed, complaining about how Ford uses those estimates is

"tantamount to permitting Plaintiffs to challenge the EPA estimates themselves," which plaintiffs cannot do. *See In re Ford Fusion and C-MAX Fuel Econ. Litig.*, No 13-MD-2450 (KMK), 2017 WL 3142078, at *10 (S.D.N.Y. July 24, 2017).

## C.

In conclusion, we hold that plaintiffs' fraud-on-the-agency claims against Ford are impliedly preempted as conflicting with federal law.[8]  The EPCA provides ample authority for the EPA to regulate testing, deter fraud, and publish its own fuel economy estimates.  The EPA must balance several objectives in doing so, and state-law tort claims would skew this balance. "For the reasons stated above, we think this sort of litigation would exert an extraneous pull on the scheme established by Congress, and it is therefore pre-empted by that scheme." *Buckman*, 531 U.S. at 353.

## IV.

For the foregoing reasons, we affirm the judgment of the district court.

---

[8]We do not pass any opinion on the applicability of this analysis in the event that the EPA itself determines that a manufacturer committed fraud in its fuel-economy testing. *Cf. Buckman*, 531 U.S. at 353–54 (Stevens, J., concurring) (noting that, if the agency had found fraud, "a plaintiff would be able to establish causation without second-guessing the FDA's decisionmaking or overburdening its personnel, thereby alleviating the Government's central concerns regarding fraud-on-the-agency claims"); *Garcia*, 385 F.3d at 966 (explaining that *Buckman* applied to a plaintiff's claim "on the basis of *state court* findings of fraud on the FDA," but that similar concerns would not arise "when the *FDA itself* determines that a fraud has been committed on the agency during the regulatory-approval process").  Such a situation is not before us as the EPA closed its own investigation into Ford's alleged fraud without further action.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

No. 22-1245

IN RE: FORD MOTOR COMPANY F-150 AND RANGER TRUCK FUEL
ECONOMY MARKETING AND SALES PRACTICES LITIGATION.

---

MARSHALL B. LLOYD; TRACEY TRAVIS; DUSTIN DAWSON and RICK
SHAWLEY; MICHAEL SMITH; EVAN ALLEN; AL BALLS; BRIAN LEJA;
STEPHEN MATTSON; JOHN SAUTTER; RANDY TRANSUE; RICK
SHURTLIFF; RONALD J. DISMUKES; JEFFERY FOSHEE; ACCURATE
CONSTRUCTION CORPORATION; STEVE BEAVERS; DAVID BREWER;
RYAN COMBS; VICTOR PEREZ; HAROLD BROWER; KYLE MANNION;
NICHOLAS LEONARDI; DEAN KRINER; JAMES WILLIAMS; MATTHEW
COMBS; DUSTIN WALDEN; STEVEN HULL; KENNETH BERNARD; MARK
HILL; CODY SMITH; DANIEL GARDNER; ROBERT GOOLSBY; JOHN JUNG;
MATTHEW SMITH; JOSH BRUMBAUGH; RYAN HUBERT; WILLIAM DON
COOK; HILARY GOODFRIEND; KATHRYN HUMMEL; SCOTT FORMAN;
DILLON DRAKE; RAMIN SARTIP; DARREN HONEYCUTT; AHMED ABDI;
JAMAR HAYNES; SCOTT WHITEHILL; MATTHEW BROWNLEE; BENJAMIN
BISCHOFF, STEPHEN LESZCZYNSKI; CASSANDRA MORRISON; ROBERT
RANEY; DAVID POLLEY; MARK NAPIER; KEITH FENCL; MARK ARENDT;
HARVEY ANDERSON; ROSALYNDA GARZA; JEFFREY QUIZHPI; JEFFREY
KALOUSTIAN; RONALD CEREMELLO; RANDALL MAINGOT; GEORGE
ANDREW RAYNE; ROBERT LOVELL; SAMUEL HUFFMAN,

> Plaintiffs - Appellants,

> v.

FORD MOTOR COMPANY,

> Defendant - Appellee.

**FILED**
Apr 21, 2023
DEBORAH S. HUNT, Clerk

---

Before: GRIFFIN, BUSH, and MURPHY, Circuit Judges.

**JUDGMENT**

On Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.

THIS CAUSE was heard on the record from the district court and was argued by counsel.

IN CONSIDERATION THEREOF, it is ORDERED that the judgment of the district court is AFFIRMED.

**ENTERED BY ORDER OF THE COURT**

_____
Deborah S. Hunt, Clerk